## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **George H. Thompson,** | : | |
| | : | **Case No. C2-04-291** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **JUDGE ALGENON L. MARBLEY** |
| | : | |
| | : | |
| **John E. Potter,** | : | |
| **Postmaster General** | : | **Magistrate Judge King** |
| | : | |
| **Defendant.** | : | |

## <u>OPINION AND ORDER</u>

### I.  INTRODUCTION

This matter is before the Court on the  Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedures brought by Defendant, John E. Potter, Postmaster General, United States Postal Services ("Postal Service").  For the reasons set forth herein, Defendant's Motion is **GRANTED**.

### II.  FACTS[1]

#### A. Plaintiff's Custodial Position with the London, Ohio Postal Service

Plaintiff, George Thompson ("Thompson"), was a letter carrier for the U.S. Postal Service from the date of his hire on August 16, 1980 until September 1992.  In September 1992, due to a medical condition with his feet that made him unable to carry mail, worker's compensation approved Thompson's claim, and he began an LDC-69 "Limited Duty" custodial

---

[1]These facts are drawn from Plaintiff's Complaint, and Defendant's Motion for Summary Judgment with its accompanying Exhibits.  The facts are either uncontroverted or, if controverted, viewed in the light most favorable to the Plaintiff.

position at the London, Ohio Post Office.[2]  Thompson's new position included both custodial

duties – for an average of twenty to twenty-five hours per week – and noncustodial duties – for

the remaining fifteen to twenty hours per week.[3]  On average, Thompson, who was the London,

Ohio Postal Office's only custodian at that time, worked Monday through Friday from 7:00 a.m.

to 5:00 p.m., with a required two-hour lunch break.  Though the parties disagree as to many of

Thompson's specific duties as a "Limited Duty" employee, they do agree that Thompson was at

least responsible for the following custodial and noncustodial tasks.

## 1. Custodial Duties

Thompson's custodial duties included cleaning and dusting throughout the building and

performing small maintenance tasks, such as replacing light switches, light bulbs, and air

conditioning filters.  He generally swept and mopped the workroom floor every day; to do so, he

moved equipment, mail carts, and boxes.  He also mopped the four bathroom floors daily.

Thompson emptied approximately thirty trash cans per day, twenty to twenty-five of which were

below the knee – "short cans."  He generally emptied the trash cans in the lobby and at the

carrier desks two times per day.  Thompson was in charge of un-crating and assembling desks

and carrier cases, as well as building cardboard displays.  Finally, outside of the Post Office,

Thompson cleaned trash off of the sidewalk, lawn and parking lot, and during the winter,

---

[2]In his Deposition, Thompson stated that he ceased carrying mail because he had been diagnosed with a condition that caused recurrent tumors in his feet.  When he continued to suffer from these tumors, his podiatrist, Dr. Norton, forced him to undergo two operations in a period of twelve months.  After those surgeries, Thompson states that his doctor gave him a *permanent* fifty-pound weight restriction, and told him that there would be "no more carrying."  Pl.'s Dep. at 52.  Since undergoing his two back-to-back foot surgeries. Thompson claims that he remains limited by Dr. Norton's initial restrictions.  *Id*. at 141.

[3]Thompson alleges that the Postal Service described his new job as custodian/maintenance/mail-duty.  Pl.'s Dep. at 140.

removed snow with a shovel and a snowblower.

## 2. Noncustodial Duties

Thompson's noncustodial duties included sorting mail into mail carts called All Purpose

Containers ("APCs"), which, the parties agree, weigh approximately 200 to 250 pounds when

empty, and approximately 1,000 to 2,000 pounds when filled with mail.  Most days, after sorting

the mail into APCs, Thompson rolled the APCs onto the loading dock to be taken by truck to

Columbus at 5:00 p.m., except for those days on which he also had to prepare the APCs for pick-

up by an earlier truck, which arrived at 2:30 p.m.  In general, Monday through Friday, Thompson

loaded and pulled or pushed out to the dock approximately eight to twelve APCs per truck run.[4]

The truck onto which the APCs were loaded also brought mail to London, Ohio, so Thompson

had to pull APCs back into the building once they were emptied.  The Post Office avers that

Thompson's work hours, including the two-hour lunch break, were set, in part, so that he could

prepare the APCs for the truck run in the afternoon while still being limited to forty hours of

work per week.

Thompson was unhappy with his new position, and he asserts that he only accepted the

job "under protest."[5]  Thompson contends, among other things, that the London Post Office

_____

[4]Thompson also alleges that at least three days a week, he was "stuck with" the job of
emptying the heavy tubs holding Undeliverable Bulk Business Mail ("UBBM") even though it
was technically his "supervisor's responsibility."

[5]In accepting the position, Thompson protested against three specific aspects of his job.
First, he did not want to be "in three different crafts" as it would prevent him from easily joining
a Union.  Next, he alleged that, though past custodians were given forty hours per week in which
to perform the job, the Postal Service had limited the time allotted to his custodial duties to
approximately twenty-five hours per week.  He complained that, as a result, he had a job offer
"that ha[d him] doing almost anything that the Boss wants [him] to do."  Third, Thompson did
not agree with his allotted hours, especially the mandatory two-hour lunch.  He argued that
because the custodian before him "worked from 6:30 a.m. to 3:00 p.m. Monday through Friday,"
he was entitled to those hours as well.  Finally, Thompson also protested that the Postal Service

should *not* have assigned him any noncustodial duties.  He argued that the former London Post Office custodian was given forty hours per week to perform the same duties for which he was given approximately twenty-five hours.  Further, he was especially unhappy with his mandatory two-hour lunch, and he would have rather had a one hour lunch, which would allow him to leave work at 4:00 p.m.[6]

### B. Thompson's Back Injury & Resulting Work Restrictions

On May 11, 1998, Thompson injured his back at home[7] while lifting his then seven-year-old son into his Ford Explorer.[8]  On the day of his injury, Thompson reported to work and attempted to carry out his normal duties – sweeping, mopping, and emptying trash cans, among other things.  Later that day, when his injury had not improved, Thompson left work to see his family physician, Dr. Joseph Jeu ("Dr. Jeu"), for treatment.

Dr. Jeu initially diagnosed Thompson with a probable lumbar strain, prescribing him both muscle relaxants and pain medications.  He also instructed Thompson to use ice and to take one

---

had not put the details about his available vacation time into writing.

[6]Defendant alleges that he wrote a number of letters of protest to the Carolyn Hanks ("Hanks"), the London Ohio Postmaster, as well as many of his union representatives.  Nonetheless, his position and his assigned duties remained the same.

[7]Though Thompson protests that, long before he hurt his back lifting his son, he suffered from degenerative disc disease that was aggravated by the tasks he performed at the London, Ohio Post Office, worker's compensation rejected his assertions and told him he could not argue that he had a pre-existing injury when he had never gone to a medical doctor for a proper diagnosis or filed an official injury report.

[8]Information about Thompson's medical records can be found in certain records in Thompson's medical files.  Doc. 1814 is the first page of the medical report ending at MR 20.  Counsel has stipulated as to the authenticity and admissibility of certain records in Thompson's medical files, as indicated in the "Joint Stipulation of Authenticity and Admissibility of Documents" ("Stipulation") at Ex. C.

week off from work.  Later, at a May 15, 1998 follow-up appointment, Dr. Jeu ordered an X-ray and an MRI.  When the test results came back, he changed his diagnosis to "lumbar strain and degenerative disc disease, with significant disc protrusion."  Dr. Jeu recommended that Thompson take an additional two or three weeks off of work and advised him to undergo physical therapy ("PT").  He also prescribed Thompson more medication to help him control his pain.

According to Thompson, though his health improved with PT, his back was still sore on occasion.  Dr. Jeu indicated instructed could return to work on Monday June 8, 1998, but that he should be restricted from pushing and pulling APCs.  Further, Dr. Jeu prescribed a set of "temporary work restrictions" dated June 8, 1998, which prohibited Thompson from driving, pushing, pulling, and repeated bending.

On June 22, 1998, Thompson returned to work at the London Ohio Post Office. Thompson's district supervisor, Bill Jarrells ("Jarrells")[9], instructed Thompson to perform his job within the boundaries of his restrictions and to tell Jarrells what tasks he was unable to perform. Thompson told Jarrells that his back still hurt, preventing him from performing all of the tasks his job required.

On July 2, 1998, Thompson filed a worker's compensation claim for his off-the-job back injury, stating that Dr. Jeu had told him he had injured his back "by a long term of heavy pulling [and] pushing [and] lifting."  While Thompson's worker's compensation claim was pending, pursuant to the Federal Employee Compensation Act ("FECA"), 5 U.S.C. §§ 8101-8193, the Postal Service was obliged to provide Thompson with forty hours pay per week, regardless of

---

[9]His other supervisor was Postmaster Hanks.

the fact that he was unable to complete all of his assigned tasks.

Thompson alleges that Hanks was unhappy with his filing a worker's compensation claim, and that she told him "she did not believe in worker's compensation." Regardless of Hanks' alleged statements, the U.S. Department of Labor ("DOL") denied Thompson's worker's compensation claim on September 24, 1998.[10]  Thompson alleges that, at that time, Hanks informed him, "we don't have to give you any hours now because it's not a worker's compensation claim, so we don't have to keep you."

Because Thompson stated that his back condition had not improved by October, Dr. Jeu gave him more limiting work restrictions on October 22, 1998.  In addition to his prior restrictions, Thompson was, from then on, to avoid bending and stooping, and the time spent kneeling, climbing and reaching above his shoulders was limited to one hour per day; the previously imposed driving restriction, however, was lifted.

Soon after Thompson told his employers about his new work restrictions, on October 30, 1998, Hanks and Thompson discussed what duties (custodial and/or noncustodial) Thompson felt he could perform within the bounds of his new permanent work restrictions, and Hanks compiled a list of these duties.  She told Thompson to work within his restrictions, and she asked that he request help when necessary.

The following Monday, November 2, 1998, after his worker's compensation claim had been denied, because the Postal Service was no longer obligated to provide him forty hours per week pursuant to FECA, Thompson began working fewer hours each week.  The Postal Service began to contract out certain cleaning duties that had previously been assigned to Thompson at a

---

[10]Thompson appealed the denial, and the DOL denied his appeal on December 6, 1999.

cost of $9,245.60 per year.[11]  During November, Hanks allegedly observed Thompson working outside his restrictions two times, and, on a third occasion, found him standing in the lobby instead of boxing mail.  In response, she issued him a "Letter of Warning."[12]  Thompson alleges that, in allegedly performing work outside of his medical restrictions, Thompson was merely following Hanks' understanding of what jobs he could and could not perform.

On November 17, 1998, Thompson attended a "Rehab Consultation" with Dr. George Waylonis, the Medical Director of the Physical Rehabilitation Unit at Madison County Hospital. Dr. Waylonis wrote that Thompson's job included "maintenance activities and some lifting, bending, and stooping," and that Thompson's "back problem was not *caused* by his job, but [was] likely to be aggravated by the physical demands of his job."  Accordingly, Dr. Waylonis commented that the Postal Service should allow Thompson an opportunity to "change his job assignment to one that does not require repetitive use of the back (i.e. avoid bending, stooping, heavy lifting, squatting, kneeling, climbing stairs, or crawling)."  Moreover, Dr. Jeu concurred with Dr. Waylonis' assessment, and he cited Dr. Waylonis' report in his December 2, 1998 letter written to support Thompson's application for disability retirement benefits.  In his Statement of

---

[11]Thompson alleges that in 1998, Hanks hired "a guy that was partially disabled, he couldn't climb ladders or anything, to come out and do my job because she wouldn't let me do my job because she said I wasn't able to do my job after my doctor said I was able to do my job. . . . I don't remember his name.  He wasn't there that long because he was not in very good health.  He was a contract worker that she hired on her own." Pl.'s Dep. at 122-23.

[12]According to Thompson, his work performance was good; he asserts that though he did not receive regular evaluations, the feedback he received from Jarrells was "positive." Pl.'s Aff. ¶ 4.  Further, according to Thompson, the Post Office has a "progressive discipline policy" which begins with oral discussions, then proceeds to written warnings followed by suspensions and, ultimately, termination. *Id*.  Thompson contends that the only discipline he had in his personnel file at the time he was let go was "a written warning [from Hanks] for working beyond his medical restrictions." *Id*.

Disability, dated November 16, 1998, Thompson wrote that "I am not able to perform all of my jobs because of my back.  I can't push [and] pull mail carts, can't bend over to do my jobs."[13]

On November 17, 1998, Dr. Jeu issued Thompson a third set of permanent work restrictions, which the Postal Service received on November 27, 1998.  According to Thompson, these work restrictions were considerably less limiting.  He states that "no bending" became "no more than two hours per day of bending," and no repeated bending.  Also, "one hour of reaching over the shoulder each day" became "no more than four hours."  Further, "no pushing or pulling" became "no pushing or pulling greater than 200 pounds."

In late 1999 or early 2000, Thompson began to tell Hanks that if she would permit him, he would be able to perform his job.[14]  Nevertheless, the late November 1998 work restrictions prohibiting Thompson from doing several activities were still in effect.  As such, Hanks sought further clarification on the extent of Thompson's restrictions.  On January 10, 2000, she asked Thompson to provide further documentation indicating that he could perform his job duties.  Thompson told Hanks she had all the documentation she needed and that if she required more, she should send him for a fitness for duty exam.

_____

[13]The Office of Personnel Management ("OPM") denied Thompson's first application for disability retirement, but Thompson was ultimately successful in receiving those benefits after separation.  *See generally*, 5 C.F.R. § 831.1203 ("Basic Requirements for Disability Retirement").  Thompson alleges that he does not know the exact date that OPM approved his disability retirement, but he remembers receiving a letter and a phone call telling him his disability had been approved in August of 2003. Pl.'s Dep. at 216.

[14]In her declaration, Hanks asserts that "[i]n late 1999 or early 2000, Mr. Thompson began telling me that he could do his job if I would just let him, that he could perform all of his custodial work and clerk duties with the exception of dispatching mail, and that he wanted a fitness for duty exam.  Mr. Thompson did not tell me he could do his job before late 1999 or early 2000 and had not provided me with any updated medical restrictions subsequent to the work restrictions dated November 17, 1998." Hanks' Dep. ¶¶ 16-17.

On February 15, 2000, Dr. Jeu faxed Hanks a new set of work restrictions pertaining to Thompson.  These restrictions, dated February 3, 2000, still prohibited Thompson from stooping, kneeling, repeated bending, and pushing or pulling rolling equipment weighing a minimum of 200 pounds.  The restrictions did, however, allow him to climb to change light bulbs.  Hanks again requested that Thompson have his doctor clarify which specific duties that he could perform based upon his medical restrictions.  In response, Hanks alleges that Thompson told her, "you've got what you're gonna get."

On February 24, 2000, Hanks wrote a letter to Hilliard Family Medicine describing Thompson's job and seeking further clarification about which duties he could perform safely given his new work restrictions.  She mailed this letter to Dr. Jeffrey Smith, MD, who, on March 2, 2000, enclosed Hanks' letter with his own request addressed specifically to Dr. Jeu.

Meanwhile, on March 1, 2000, Hanks asked Thompson to demonstrate how he could perform specific custodial duties within his work restrictions dated February 3, 2000, and she alleges that, from what she observed, Thompson was unable to clean effectively without violating his work restrictions.[15]  Specifically, Hanks said that Thompson could not adequately sweep underneath cases, vacuum, or case box mail into post office boxes that were low because these tasks required him to stoop.  In her deposition testimony, Hanks stated that, aside from her own assessment, no one else at the London, Ohio Post Office had observed Thompson's daily

---

[15]In her deposition testimony, Hanks stated that she walked around the Post Office with Thompson and asked him to demonstrate whether he was physically capable of performing the tasks required of him.  She stated that, in the course of those demonstrations, "[t]here were some times that I did have to remind him of his restrictions, and he was unable to perform his job." Hanks' Dep. at 73.  Further, in her declaration, Hanks specified that in her observations of Thompson's attempts to perform his job, his restrictions prevented him from cleaning effectively. Hanks' Decl. ¶¶ 12-14.

activities to determine whether he could perform his job within his medical limitations. Moreover, she stated that the Postal Service's staff doctor never made a determination as to whether Thompson could or could not perform his duties, and, instead, merely asked her to make sure that she had Thompson "work within his restrictions."

According to Hanks, Thompson told her that he had instructed Dr. Jeu not to respond to Hanks' request to clarify his restrictions. Further, the Postal Service's request to Dr. Jeu is in Thompson's medical file, and Defendant alleges that Dr. Jeu's handwritten notation on the letter reflects Thompson's order that Dr. Jeu not respond to the Postal Service. Defendant alleges, therefore, that the Postal Service never received a response because of Thompson's order to Dr. Jeu.

### C. Separation for Disability Pursuant to Employee and Labor Relations Manual 365.341 Due to Plaintiff's Inability to Perform the Duties his Position Requires

On March 9, 2000, the Postal Service gave Thompson the following options[16]: (1) request

---

[16]In his deposition testimony, Jarrells states that labor relations had instructed him that these were Thompson's *only* options. Jarrells' Dep. at 50. The memorandum from Hanks to Thompson read, in relevant part:

> Evidence of your record indicates that you are unable to perform the duties of your position. Based upon documentation received from your treating physician, Dr. Jeu dated March 3, 2000, you are permanently disabled from the regular duties of Building Maintenance Custodian. . . .It is your responsibility as a Postal employee to perform the regular duties of Building Maintenance Custodian. Your inability to do so negates your performance of this function. Efficiency is compromised and the Postal Service must contract outside sources and incur unnecessary added expense to perform the key position of Building Maintenance Custodian. The agency as well as the workforce entrust[s] the dependability and efficiency of each custodian to provide a safe and clean work environment on a daily basis. Your inability to provide such an environment places an undue burden on the agency and adversely affects the overall climate and efficiency factor of the London Post Office. Furthermore, it has become necessary for the duties of your position to be contracted to an outside cleaner, costing the Postal Service and additional $9,245.60 per year. Therefore, you are being separated under the guidelines of ELM 365.341.

permanent light duty; (2) apply for disability retirement; or (3) resign. On March 17, 2000,

Thompson applied for permanent light duty.[17] To his application, Thompson attached a copy of

his most recent work restrictions from Dr. Jeu, which were dated February 3, 2000.[18] Because

there were no light duty positions available for Thompson, on May 12, 2000, the Postal Service

issued a Notice of Proposed Separation for Disability to Thompson, pursuant to the Postal

Service's Employee and Labor Relations Manual (ELM) 365.341, citing Thompson's inability[19]

to perform the regular duties of his position.[20] Thompson's disability separation became

_____

*See* Hanks' Dep. Ex. 5 at 1.

[17]Thompson alleges that although he did not want to work in a permanent light duty position, because he had to provide for himself and his family, he was obligated to take what he could get. Pl.'s Dep. at 223. He admits that he does not know whether there was a permanent light duty position available at the time he applied for one on March 17, 2000. *Id.*

[18]In his deposition testimony, Jarrells asserts that Mr. Thompson requested a transfer to the Columbus, Ohio Post Office, but, because of his poor attendance record and on-the-job injuries which prevented him from doing his job, he was denied the transfer. Jarrells' Dep. at 44-45. Further, in her Declaration, Hanks alleges that because she did not have a permanent light duty position available for Thompson at the London, Ohio Post Office, she contacted Post Office Operations Manager Steve Eldridge and the Maintenance Manager for the Columbus District, Don Vincent, to see if there were any light duty positions available within Thompson's restrictions. Hanks Decl. ¶ 17. Nonetheless, neither Mr. Vincent nor Mr. Eldridge was able to locate an appropriate light duty position for Mr. Thompson, and, the Postal service offered him disability retirement. *Id.*

[19]In a notice to the Postal Service, Dr. Jeu wrote, "Mr. Thompson's back pain likely is not caused by his job – but is likely to be aggravated by the physical aspects of his job. His supervisor has not been able to alter his job requirements to accommodate these restrictions." Pl.'s Med. Rec. at 23. Hence, Dr. Jeu wrote that he felt disability separation "[was] reasonable in this unfortunate circumstance." *Id.*

[20]The Postal Service informed Thompson that "[b]ased upon documentation received from your treating physician, Dr. Jeu, dated March 3, 2000, you are permanently disabled from the regular duties of Building Maintenance Custodian." Hanks' Dep. at 14 - "Notice of Proposed Separation for Disability." The Employee Manual states, "Separation for disability is the separation of an employee other than a temporary, casual, or a probationary employee whose mental or physical condition renders the employee incapable of performing the duties of the

-11-

effective June 16, 2000. Eventually, the Post Office granted him disability retirement.

### D. Plaintiff's Personal Activities

Thompson testified at deposition that, recreationally, he rides bikes, plays basketball, football, and baseball with his son, and goes bowling. He stated that "for a long time" after his back injury in May 1998, he "couldn't get down and dig" to plant flowers. When he "first hurt his back" he "couldn't bend down at all" to empty the trash cans in his house. He does not remember how long this went on.

Thompson put white marble rock all around his house in 1998, and he has continued to add rock since then. In June of 1998, he dug up a small tree, moved it during home construction, and put the tree back after he had completed the home construction.[21] He planted grass in his yard during the summer of 1998. He installed a 22-foot flagpole in his front yard in 2000 or 2001.

At all relevant times after suffering his initial back injury, Thompson does not dispute that he was able to drive his vehicle,[22] cook for himself, shower, brush his teeth, comb his hair, and walk, though he does assert that at times, each of these tasks caused him pain. Moreover, after his injury, Thompson states that he had some difficulty tying his shoes until his muscle relaxer took effect; he alleges that this difficulty lasted approximately one month.

---

position." Hanks' Dep. at 14

[21]In his Memorandum Contra, Thompson asserts that "the 'tree' in question was a seedling. . .less than 18" tall and less than 1" in diameter given away by a civic organization for Arbor Day." Errol Douglas' Decl. at 12, n.5.

[22]Though he alleges that "it was hard to drive the day that hurt my back, but [I] didn't have a choice." Pl.'s Dep. at 157. Thompson drove to and from work at the London Ohio Post Office every day during the relevant time period.

### E. Thompson's Subsequent Employment

Sine leaving the Postal Service in 2000, Thompson has worked a number of different jobs.  First, from when he left the Postal Service in July 2000 through August 2000, Thompson worked full time as a receiving clerk at the "Home Place," where he unloaded boxes of store merchandise from semi-trailers and staged merchandise on the store floor.  He then worked full time as a plumber from August to December of 2000; his job was to hook natural gas tubing and waterlines to appliances through multi-unit houses.  From December 2000 through February 2001, he worked at a collection agency.

On October 30, 2000, Thompson applied to be a Corrections Officer ("CO") at the London Correctional Institution ("LCI").  As part of the application process, he completed an Orientation and Ohio Correction Officer Assessment in which he had to run 3/4 of a mile in under 7 minutes and 48 seconds, pick up and move a 50 lb. trunk twenty-five feet, and search and "shake down" bunks to test bending and reaching ability.  Thompson passed the assessment test, and LCI gave him a job offer.  After being hired, Thompson qualified in weapons training and unarmed self defense.  As a CO, Thompson made periodic rounds during which he had to climb stairs and ladders, walk, run, crawl, bend, stoop and lift.  Thompson also performed "pat downs" and "shake downs" to search for contraband on prisoners and in their bunks.[23]  On January 23, 2005, Thompson became a "storekeeper two" or commissary worker.[24]

---

[23]In his declaration, Errol Douglas, the Chief of Human Resources for the Ohio Department of Rehabilitation and Correction, Columbus, Ohio explained that a "shake down" served as a "range of motion test to show a person can reach and bend." Errol Douglas' Decl. ¶ 5.

[24]The Department of Rehabilitation and Correction laid Thompson off from April 2002 through November 2002 when other employees came LCI after the Orient Correctional Institution had closed in April 2002.  During that time period, he worked as a TSA Screener at

There is no evidence that Thompson had work restrictions when working in any of the positions listed above.  In fact, Thompson stated in his deposition that he was issued no work restrictions because "none of the jobs required me to do anything that bothered me."

### F. Procedural History

Four separate EEO claims underlie this case, two for disability discrimination and two for retaliation.

Thompson's first EEO complaint is dated December 20, 1999, in which Thompson claimed retaliation for prior EEO activity.  The retaliatory acts Thompson alleged were Hanks': (1) calling him at home at 11:40 on Monday December 20, 1999 to ask why he had not called in sick when a supervisor was on duty and instructing him to being in documentation; (2) subsequently disapproving sick leave and charging him AWOL; and (3) calling his doctor to inquire if he had to have laser corrective surgery for his eyes on Monday December 20, 1999.[25]

Thompson's second complaint is dated May 4, 2000, in which he claimed disability discrimination on March 1, 2000, when Hanks allegedly asked him to show her how he could do his job without breaking his medical restrictions.

---

the Port Columbus Airport.

[25]Thompson alleges that Hanks and Jarrells, his supervisors, unfairly denied him sick leave to get his laser eye surgery. He states that he requested to have December 20 off to receive Lasik eye surgery, but management rejected his request because the Post Office would be "very busy" on that day.  Thompson then spoke with the union, and he alleges that a union representative, who he cannot now identify, told him that the Post Office could not disallow him requested sick leave. As such, Thompson decided to proceed with the surgery, calling in sick on December 20.  In response, Hanks called Thompson at home on December 20, and told him that his absence was unacceptable and that she regarded him as "AWOL." The Defendant contends, and the Court agrees that Thompson's allegations – that Hanks retaliated by calling him at home, calling his doctor, and telling him to work – are *not* adverse employment actions as a matter of law.  *See, e.g., Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir. 1996).

-14-

In Thompson's third EEO complaint, dated June 12, 2000, he claimed both disability discrimination and retaliation on April 17, 2000. He complained that Hanks had ordered him to "pull mail" from the clerk cases even after she had allegedly told all employees not to pull mail from the clerk cases anymore.

Finally, in his last EEO complaint, dated August 26, 2000, Thompson claims disability discrimination on May 15, 2000 due to the Postal Service's issuance of a Notice of Proposed Separation for Disability on May 12, 2000, and a Letter of Decision on June 14, 2000. Thompson's claimed disability was "back-degenerative disk and arthritis."

The Postal Service ("Defendant") consolidated the four EEO claims laid out above. Thompson's claims were denied, and the EEOC's Office of Federal Operations mailed Thompson a Right to Sue letter on or about February 10, 2004. Thompson filed the instant Complaint (the "Complaint") in this Court on April 16, 2004, asserting a claim for disability discrimination pursuant to the Rehabilitation Act of 1973 ("the Act"), 29 U.S.C. §§ 701-797.[26] Section 501 of the Act, 29 U.S.C. § 791, protects federal employees from discrimination on the basis of disability. *See Johnson v. United States Postal Serv.*, 861 F.2d 1475, 1477-78 (10th Cir.

---

[26]In 1992, Congress amended the Act to substitute use of the term "disability" for "handicaps." *Reeves v. Johnson Controls World Servs., Inc.*, 140 F.3d 133, 155, n.7 (2d Cir. 1998). The court will likewise utilize the terms "disabled" or "disability," for clarity. The definition of persons covered under the Act before and after the 1992 amendments remains essentially the same. *Compare* 29 U.S.C. § 706(8) (Supp. 1998) (defining "individual with a disability") *with* 29 U.S.C. § 706(7) (1991) (defining "handicapped individual"). The regulations promulgated pursuant to the Act, 29 C.F.R. pt. 1614, were issued prior to the 1992 amendments and thus still use the outdated "handicapped" terminology. "The regulations have not caught up" with the 1992 amendments. *Knapp v. Northwestern Univ.*, 101 F.3d 473, 482, n.7 (7th Cir. 1996). Courts have used "disabled" and "handicapped" interchangeably. *See Burns v. City of Columbus*, 91 F.3d 836, 840, n.3 (6th Cir. 1996); *Pottgen v. Missouri State High Sch. Activities Ass'n*, 40 F.3d 926, 929, n.3 (8th Cir. 1994) ("The change in terminology made no substantive change to the Act.").

1988). Plaintiff specifically alleges that Defendant failed to accommodate him as a disabled individual protected under the Act and unlawfully retaliated against him, terminating his employment because he was disabled. In response, Defendant filed a motion for summary judgment. The Court heard oral argument on the matter, and the issues are now ripe for decision.

### III. STANDARD OF REVIEW

Summary judgment is appropriate "[i]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the non-moving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). In response, the non-moving party must then present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339-40 (6th Cir. 1993) (citations omitted).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The Court also must interpret all reasonable inferences in the non-movant's favor. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (stating that the court must draw all reasonable inferences in favor of the non-moving party and must refrain from making credibility determinations or weighing the

evidence). The existence of a mere scintilla of evidence in support of the non-moving party's position will not be sufficient; however, there must be evidence from which the jury reasonably could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986); *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (finding summary judgment appropriate when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party").

## IV. ANALYSIS

### A. Background on a Discrimination Claim Under the Rehabilitation Act

Plaintiff makes his claim under § 501 of the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*, which requires federal agencies and instrumentalities to implement affirmative action plans to hire, place, and advance individuals with disabilities, and which creates a private right of action against covered entities for discrimination on the basis of disability. *See id.* § 791(b).[27, 28] Employees who bring successful claims under Section 501 of the Rehabilitation Act are

---

[27]The Rehabilitation Act, and its relationship with the Americans with Disabilities Act ("ADA") can be confusing. Section 791(b) of the Rehabilitation Act requires all Federal agencies to implement affirmative action programs for the hiring, placement, and advancement of individuals with disabilities. 29 U.S.C. § 791(b). Initially, courts did not read this as creating a private right of action against federal agencies for discrimination on the basis of disability. *Smith v. United States Postal Serv.*, 742 F.2d 257, 259 (6th Cir. 1984) (reviewing the history of Section 501). In 1978, Congress amended the Rehabilitation Act to create such a right, adding a new provision stating that "the remedies, procedures, and rights set forth in Section 717 of the Civil Rights Act of 1964. . . shall be available, with respect to any complaint under Section 791 of this title [§501]." 29 U.S.C. § 794(a)(1). In 1992, Congress further amended the Rehabilitation Act "to ensure that the precepts and values embedded in the [ADA] were reflected in the Rehabilitation Act." S. Rep. No. 102-357 at 1 (1992), *reprinted in* 1992 U.S.C.C.A.N. 3712, 3713.

[28]Although the Rehabilitation Act predates the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, analyses of claims made under the two acts run roughly parallel.

entitled to the remedies prescribed by Title VII.  29 U.S.C. § 794(a)(1).  The Equal Employment

Opportunity Commission (EEOC) has promulgated regulations to implement the anti-

discrimination provisions of the Rehabilitation Act.  *See* 29 C.F.R. § 1614.103(a).  Part 1614 of

Title 29 of the Code of Federal Regulations governs Federal Sector Equal Employment

Opportunity, i.e. claims brought under section 501 of the Act.  *Id.*  It covers individual and class

complaints of discrimination and retaliation prohibited by the Rehabilitation Act.  *Id.*  Also, it

expressly applies to the United States Postal Service.  *Id.* § 1614.103(b)(3).

To make out a prima facie employment discrimination case under the Rehabilitation Act,

a plaintiff must show that: (1) he is "disabled"within the meaning of the statute; (2) he is

"otherwise qualified," that is, he can perform the essential functions of the job with or without

accommodation; and (3) the personnel action was taken by defendant because of his disability.

*See Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1178 (6th Cir. 1996).  An individual is

discriminated against when she or he is fired solely because of a disability, but discrimination

also includes "limiting, segregating, or classifying a job applicant or employee in such a way that

---

*Mahon v. Crowell*, 295 F.3d 585, 588-89 (6th Cir. 2002); *see also, McPherson v. Michigan High Sch. Athletic Ass'n*, 119 F.3d 453, 459-60 (6th Cir. 1997).  "By statute, the [ADA] standards apply in Rehabilitation Act cases alleging employment discrimination." *Id.* at 460 (citing 29 U.S.C. § 794(d)).  Further, the Court notes that recent Supreme Court decisions sharply limiting the reach of the ADA thus also apply to cases brought under the Rehabilitation Act.  *Mahon*, 295 F.2d at 588-89; *See e.g., Toyota Mfg. Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002); *Sutton v. United Air Lines Inc.*, 527 U.S. 471 (1999).

Nonetheless, "while the ADA and the Rehabilitation Act *generally* are to be interpreted and applied consistently with one another. . . the standards used to determine whether a federal employer has violated section 501 of the Rehabilitation Act will not always be identical to those brought under section 504 or under the ADA.  In particular, [courts have noted] that 'the meaning of reasonable accommodation. . . may vary due to the heightened duties ascribed to federal employers under section 501.'" *See Bennett v. Henderson*, 15 F. Supp. 2d 1097, 1104 (D. Kan. 1998) (citing *Smith v. Midland Brake, Inc.*, 138 F.3d 1304, 1311 (10th Cir. 1998) (citations and footnote omitted)).

adversely affects the opportunities or status of such applicant or employee because of [his or her] disability." 42 U.S.C. § 12112(b)(1); 29 U.S.C. § 791(g).

A plaintiff may establish a claim of discrimination under the Rehabilitation Act either by introducing direct evidence of discrimination, or by proving circumstantial evidence which would support an inference of that discrimination. *See Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000) (citing *Kline v. Tennessee Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997)). "The direct evidence and the circumstantial evidence paths are mutually exclusive; a reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993).

### B. Whether Plaintiff Has Established a Prima Facie Case of Disability Discrimination Under the Rehabilitation Act

### 1. Whether Plaintiff Has Established that He is "Disabled" Under the Rehabilitation Act

Initially, Defendant argues that Plaintiff has failed to allege a prima facie case under the Rehabilitation Act because his allegations do not establish that he is actually disabled under the meaning of the Act. Plaintiff, however, argues that, according to the record, his back condition qualifies as a "disability" protected under the law. The foregoing dispute is the threshold issue before this Court.

To be "disabled" under the Rehabilitation Act, an individual must: (1) have a physical or mental impairment which "substantially limits" him or her in at least one "major life activity"; (2) have a record of such impairment; or (3) be "regarded as" having such an impairment. *See* 29 U.S.C. § 705(20)(B)(i)-(iii). There is no blanket rule for determining when a claimant is "disabled," and the Supreme Court has established that a disability determination requires an "individualized inquiry." *Mahon*, 295 F.3d at 589 (citing *Williams*, 534 U.S. at 198 (noting that

-19-

an "individualized assessment of the effect of an impairment is particularly necessary when the impairment is one whose symptoms vary widely from person to person")). In other words, "we may not declare that all individuals who suffer from a particular medical condition are disabled for the purposes of the Rehabilitation Act." *See Sutton*, 527 U.S. at 483-84.[29]

The Rehabilitation Act regulations issued by the Department of Health, Education, and Welfare (HEW) in 1977, which appear without change in the current regulations issued by the Department of Health and Human Services, define "physical impairment," the type of impairment relevant to this case, to mean "any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive, digestive, genito-urinary; hemic and lymphatic; skin; and endocrine." *See Williams*, 534 U.S. at 195 (citing 45 C.F.R. § 84.3(j)(2)(i) (2001)).[30]

Courts consider "substantially limits" and "major life activities" to be "terms of art" under the Rehabilitation Act. *Mahon*, 295 F.3d at 590; *see, e.g., Sutton*, 527 U.S. at 481-90. First, "[s]ubstantially limits" is difficult to define, but in the Supreme Court's words, "

---

[29]For instance, the Supreme Court has noted that it would be contrary to the language of the ADA to find "all diabetics to be disabled," regardless of whether an individual diabetic's condition actually impaired his daily activities. *Sutton*, 527 U.S. at 483. "Both the letter and the spirit of the ADA require an individualized assessment of each plaintiff's 'actual condition,' rather than a 'determination based on general information about how an uncorrected impairment actually affects individuals." *See id.*

[30]Moreover, the Supreme Court noted that the HEW regulations "are of particular significance because at the time they were issued, HEW was the agency responsible for coordinating the implementation and enforcement of § 503 of the Rehabilitation Act, 29 U.S.C. § 794 (1994 ed. and Supp. V), which prohibits discrimination against individuals with disabilities by recipients of federal financial assistance." *See Williams*, 534 U.S. at 690 (citing *Consol. Rail Corp. v. Darrone*, 465 U.S. 624, 634 (1984)).

'[s]ubstantially' in the phrase 'substantially limits' suggests 'considerable' or 'to a large degree'." *Id.*; *see Williams*, 534 U.S. at 184 (citation omitted) [31]; *Sutton*, 527 U.S. at 491 (where plaintiff has not shown that he is substantially limited in his ability to perform a major life activity, but, at best, has shown he has an injury that, at times, limits his ability to perform major life activities such as walking or performing manual tasks, he is not "disabled"); *Agnew v. Heat Treating Servs. of Am.*, 2005 WL 3440432, at *4 (6th Cir. Dec. 14, 2005) (noting that temporary physical conditions, even those that may possibly recur, do not generally constitute substantial impairments and finding that plaintiff's bad back, alone, does not qualify him for disability status).

Second, "[m]ajor life activities" are "activities that are of central importance to daily life." *Mahon*, 295 F.3d at 590. Though it has not yet developed an exhaustive list of these activities, Court in *Mahon* cited, with approval, the regulations promulgated under the Rehabilitation Act defining major life activities to include "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and

---

[31]In *Williams*, the Supreme Court explained that "the word 'substantial' thus clearly precludes impairments that interfere only in a minor way with the performance of manual tasks from qualifying as disabilities." *See* 534 U.S. at 197; *see also, Albertson's, Inc. v. Kirkingburg*, 527 U.S. at 565 (explaining that a "mere difference" does not amount to a "significant restric[tion]" and therefore does not satisfy the EEOC's interpretation of "substantially limits").

working." *Id.*; 45 C.F.R. § 84.3(j)(2)(ii)[32]; *see also Williams*, 534 U.S. at 184.[33] Moreover,

*Mahon* explained that "these terms need to be interpreted *strictly* to create a demanding standard

for qualifying as disabled. *Mahon*, 295 F.3d at 590 (citing *Williams*, 534 U.S. at 184, 200

_____

[32]"Although not binding on [this Court's] interpretation of the Rehabilitation Act, the ADA borrows extensively from the Rehabilitation Act, and uses many of the same terms." *See Hamm v. Runyon*, 51 F.3d 721, 725 (7th Cir. 1995); *see Hedberg v. Indiana Bell Tel. Co., Inc.*, 47 F.3d 928, 932 (7th Cir. 1995) (interpreting the ADA). The ADA provides that the following factors should be considered in determining whether an individual is substantially limited in a major life activity: (i) the nature and severity of the impairment; (ii) the duration or expected duration of the impairment; and (iii) permanent or long-term impact of or resulting from the impairment. *See* 29 C.F.R. § 1630.2(j)(2).

[33]In *Williams*, the Supreme Court explained that "working" could, on occasion, be considered "a major life activity." *See* 534 U.S. at 200; *see* 29 C.F.R. § 1630.2(j)(3) (2001) ("with respect to the major life activity of *working*[,] [t]he term *substantially limits* means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs of jobs in various classes as compared to the average person having comparable training, skills and abilities."); *see also*, 534 U.S. at 200; *Agnew*, 2005 WL 3440432 at *5. Though they are split on the issue, some circuits have held that the requisite individualized inquiry involves consideration of the impairment's effect on a plaintiff's employment prospects. *See, e.g. Webner v. Titan Distrib., Inc.*, 267 F.3d 828, 834 (8th Cir. 2001); *Burns v. Coca-Cola Enters., Inc.*, 222 F.3d 247, 254 (6th Cir. 2000); *Quint v. A.E. Staley Mfg. Co.*, 172 F.3d 1, 11-12 (1st Cir. 1999). In fact, the Sixth Circuit noted that "[b]ecause of the problems surrounding 'working,' however, we shall treat it as suggested by the EEOC, as a residual category resorted to only when a complainant cannot show she or he is substantially impaired in any other, more concrete major life activity" like caring for oneself, breathing, seeing, hearing, and the like. *See Mahon*, 295 F.3d at 590-91 (citing *Sutton*, 527 U.S. at 492). Nonetheless, in this case, Plaintiff's argument that his back injury prevented him from "working," would fail because, once he was let go at the Postal Service, he still had access to a number of jobs – some of which, like his job as a CO, were arguably quite physically demanding. As such, despite his back injury, Plaintiff certainly retained the ability to engage in a wide range of daily activities and to work in many jobs in his geographic region, and a reasonable juror could not find that his impairment substantially limits his ability to work, or, for that reason, renders him disabled for purposes of the Rehabilitation Act. *See Taylor v. Fed. Ex. Corp.*, 429 F.3d 461, 465 (4th Cir. 2005) (though "the vocational evidence that [plaintiff] presented suggests that his impairment precluded him from a number of jobs for which he would be qualified absent his injury, it does not suffice to create a jury question as to whether the impairment substantially limited the asserted major life activity, i.e. working. Rather, the record indisputably reveals that [plaintiff] could perform a range of daily activities requiring endurance, flexibility and some strength, and that even with the impairment, he qualified for over 1,400 different types of jobs, and over 130,000 actual jobs in the Baltimore-Washington region.").

(finding that "household chores, bathing, and brushing one's teeth are among the types of manual tasks of central importance to people's daily lives") (emphasis added)); *see Bennett*, 15 F. Supp. 2d at 1106 (noting that the Rehabilitation Act should be interpreted to mean that the individual is "either unable to perform, or significantly restricted as to the condition, manner, or duration under which the individual can perform a major life activity as compared to an average person in the general population."); *see Powers v. Runyon*, 974 F. Supp. 693, 701 (S.D. Ind. 1997) (Courts have specifically adopted the Rehabilitation Act's strict definition of "disabled" "in cases brought against the Post Office under section 501 of the Rehabilitation Act, 29 U.S.C. § 791").[34]

The parties do not dispute that Thompson injured his back in May 1998, or that Dr. Jeu diagnosed his condition as a "lumbar strain" with significant "disc degeneration" and "disc protrusion." Further, the parties do not dispute that after Dr. Jeu's diagnosis, Thompson was given a number of work restrictions limiting his job performance, underwent PT to help him recover from his injury, and took pain medication to alleviate his symptoms. Nonetheless, though Plaintiff contends that his back injury is a "disability," Defendant counters that Thompson is not "disabled" for the purposes of the Rehabilitation Act because he has failed to set forth evidence that his back injury substantially limits him in any major life activity.

The Court finds that Thompson has not established that his back injury qualifies as a

_____

[34]The Supreme Court has explained that "[i]f Congress intended everyone with a physical impairment that precluded the performance of some isolated, unimportant, or particularly difficult manual task to qualify as disabled, the number of disabled Americans would surely have been much higher." *Williams*, 534 U.S. at 197; *see also, Sutton*, 527 U.S. at 487 (finding that because more than 100 million people need corrective lenses to see properly, "[h]ad Congress intended to include all persons with corrected physical limitations among those covered by the [ADA] it undoubtedly would have cited a much higher number [than 43 million] disabled persons in the findings").

"disability" under the Rehabilitation Act. This case is factually similar to *Mahon v. Crowell*, where the plaintiff, Mahon, suffered from a herniated disk which he acquired "on-the-job." *See* 295 F.3d at 590-91.[35] Though the court found that Mahon's herniated disk was an impairment, the court affirmed the district court's ruling that it did not rise to the level of a "disability." *Id*. at 590-91. The court first analyzed whether Mahon's injury substantially limited him in major life activities other than working. *Id*. at 590. The Court found, however, that although Mahon had produced significant evidence that his back injury "cause[d] him distress and limit[ed] him in performing some activities," he had failed to show that it "considerably or profoundly limit[ed] his ability to sit, stand, bend, stoop, walk, climb or lift." *Id*. at 590-91. Further, the Court found that because he admitted in a deposition that he could still perform household tasks, clean gutters, fix plumbing, walk a mile, work on his car, and perform other moderately "strenuous"

---

[35]These facts are peripheral to the Court's assessment of Mahon's back injury, but are helpful in understanding the Sixth Circuit's holding. *See Mahon*, 295 F.3d at 586-89. In *Mahon*, plaintiff, David Mahon worked as a steamfitter for the Tennessee Valley Authority ("TVA"). *Id*. at 587. After working as a full-time steamfitter for twelve years, in 1988, he suffered a herniated disk in an "on-the-job" work injury. *Id*. Thereafter, from 1988 through 1990, Mahon "alternately worked for TVA either as a steamfitter on 'sedentary duty,' meaning that on a physician's recommendation TVA restricted his bending, lifting, and climbing at work, or was laid off from work entirely, and received worker's compensation under the Federal Employees Compensation Act. *Id*. From 1990 through 1996, Mahon took part in a DOL re-employment initiative at TVA in which he performed various clerical and assistant tasks at a local nuclear power plant as a "steamfitter(rehab)" and a "maintenance mechanic(rehab)." *Id*. In 1996, however, TVA "announced it would eliminate the [DOL] re-employment initiative and participants unable to secure other TVA jobs would be laid off. While applying for other jobs in TVA, Mahon discovered that, because of his participation in the program, he was on a retention register with other program participants," and, in 1997, he lost his job in a reduction-in-force, and was also no longer eligible for worker's compensation. *Id*. at 588. Mahon sued TVA alleging that it had discriminated against him because of his herniated disk in violation of the Rehabilitation Act, and that the re-employment initiative was merely a ploy by the TVA to reduce its worker's compensation costs by hiring otherwise unemployable former employees receiving worker's compensation, keeping them employed only until they had been established as rehabilitated, and then firing them at the first opportunity. the TVA classified and fired him on account of a disability in violation of § 501 of the Rehabilitation Act of 1973. *Id*. at 587.

-24-

physical activities while working for TVA, his impediments were not sufficiently severe enough to "render him disabled." *Id*.

Similarly, in this case, Plaintiff's degenerative disc disease, although an impairment, is not severe enough to render him "disabled."  Notwithstanding the fact that Thompson has established that he was in pain after hurting his back and notes that his injury may have impacted his ability to perform certain elements of his position with the Postal Service, viewing the facts in the light most favorable to Thompson, his injury, even at its worst, did not keep him from performing any major life activities, especially in his personal life.  In fact, in his deposition testimony, Thompson concedes that he was able to function in his personal life, stating that, "at all relevant times after suffering his initial back injury," he was able to drive, cook for himself, shower, brush his teeth, comb his hair, walk, and tie his shoes.  *See Williams*, 534 U.S. at 202 (finding that because the manual tasks that plaintiff Williams could not perform were *not* an important part of most people's lives and because, even when her condition worsened, Williams "could still brush her teeth, wash her face, bathe, tend her flower garden, fix breakfast, do laundry, and pick up around the house," she was not disabled as a matter of law).  Further, though Thompson also argues that his back injury prevents him from taking long bike trips, play sports with his children, bowl, work in his garden, or empty trash at home, as none of these are "major life activities" under the terms of the law, they are irrelevant to the Court's inquiry. Therefore, Plaintiff has failed to allege sufficient facts to raise a genuine issue of material fact as to whether he may be considered "disabled" under the Rehabilitation Act.[36]

---

[36]Further, the Court notes that Plaintiff's case is easily distinguishable from *Oszust v. Stone Container Corp*, a case on which Plaintiff relies to establish that he was "disabled."  *See* 2002 WL 19385, at *1 (S.D. Ohio Jan. 17, 2002).  In *Oszust*, plaintiff, Mr. Oszust worked as a bulldozer operator for defendant, Container Corporation, until he ruptured a disc in his back and

Moreover, Thompson allegedly told Hanks that he was "not disabled," and that, if she would only allow him to do his job without interruption, he would do so.  In direct opposition to his own claims, however, Thompson gave Dr. Jeu a letter stating that he couldn't do jobs "because of my back.  I can't push [and] pull mail carts, can't bend over to do my jobs."  *See* Pl.'s Opp. at 8.  Even though on a defendant's motion for summary judgment, the Court must consider the facts in the light most favorable to the plaintiff, the plaintiff cannot expect to present two conflicting arguments and have the Court interpret both sets of facts to his advantage.

Finally, Plaintiff's subsequent work provides additional evidence that his back injury was not sever enough to qualify as a "disability."  First, when Thompson worked as a receiving clerk at the "Home Place," he states that he had to unload boxes weighing far more than 200 pounds and concedes that he did so without incident.  Second, to become a CO, he had to pass a demanding physical assessment and make periodic rounds, both tasks that required walking, running, crawling, bending, stooping and lifting – each activities that Thompson had told Hanks that his back injury kept him from doing when he worked as a custodian.  Though Thompson

---

had to undergo surgical repair.  *Id*. at *1-2.  When Oszust did finally return to work, he was medically restricted to working fewer than eight hours per day, and, soon after he returned he was fired when defendant claimed that being available to work up to twelve hours per day was a critical job requirement due to scheduling issues.  *Id*.  Stone Container argued that a person whose sole work restriction is not working longer than eight hours per day cannot be considered "disabled."  *Id*. at *7.  Nonetheless, Judge Sargus found that Oszust had a back-related disability.  *Id*. at *6-7.  The Judge noted that plaintiff had identified substantial limitations in the "major life activities" of performing manual tasks, walking, and working; among other things, the plaintiff could not stand or sit for more than fifteen to twenty minutes, could not lift more than a few pounds, and could not bend to tie his shoes without assistance.  *Id*.  Though the Court does not dispute that Plaintiff Thompson had back problems, his injuries are certainly not comparable to those of Mr. Oszust.  Further, unlike Mr. Oszust, Thompson fails even to identify a major life activity in which he is substantially limited, let alone provide any specific evidence of such a limitation.

-26-

does not point out how these activities *differed* from any of the activities that caused him pain at the Postal Service, he states that he was issued no work restrictions in his subsequent employment because "none of the jobs required me to do anything that bothered me." Thompson's failure to account for his ability to perform the same tasks that, just two years before, were "impossible" for him because of his "disability" points out a serious flaw in his argument. Even viewing the facts in Thompson's favor, it seems far-fetched that Thompson would "not be bothered" by physical activities that he claims nearly incapacitated him just two years before. Looking at all of the evidence, as well as the fact that the Rehabilitation Act calls for a strict interpretation of who may qualify as "disabled," the Court finds that Thompson's back injury does not qualify as a "disability."

## 2. Whether Plaintiff Was "Regarded As Disabled"

Plaintiff next attempts to argue that, even if his impairment is not a "disability" as a matter of law, Defendant at least "*regarded [him] as* disabled." A plaintiff may prove that he is an individual with a disability under the "regarded as" prong of the Rehabilitation Act, "by showing that either: (1) the employer mistakenly believes the employee has a physical impairment that substantially limits a major life activity; or (2) the employer mistakenly believes that an actual, non-limiting impairment substantially limits a major life activity." *See Mahon*, 295 F.3d at 592 (quoting *Sutton*, 527 U.S. at 489); *see also, Branham v. Snow*, 392 F.3d 896, 904 (7th Cir. 2005).

Congress intended the "regarded as" prong to shield employees from being viewed through a disabling lens of "myths, fears, and stereotypes that can accrue around a perceived or actual impairment." *See Mahon*, 295 F.3d at 585 (quoting *Sutton*, 527 U.S. at 489-90). An

-27-

employer who alters work requirements or discharges an employee due to his work restrictions related to an impairment is not "regarding" the employee as disabled. *Id.* at 592. Rather, the plaintiff must show that the employer mistakenly regarded him as substantially limited in a major life activity central to most people's daily lives. *Id.*; *see also, Mack v. Great Dane Trailers*, 308 F.3d 776, 780-81 (7th Cir. 2002) (holding that concepts of "substantially limits" and "major life activity" are the same regardless of whether the employee argues actual or "regarded as" disability).

Thus, "the Court's focus in the ['[]regarded as['] disabled inquiry is not on the defendant's belief about the plaintiff's ability to perform functions on the job, but rather the defendant's belief about the 'effect of the impairment on the individual's daily life.'"[37] *See Dunaway v. Ford Motor Co.*, 134 Fed. Appx. 872, 878 (6th Cir. May 25, 2005) (citing *Equal Opp. Employment Comm'n v. DaimlerChrysler Corp.*, 111 Fed. Appx. 394, 399 (6th Cir. 2004)). Further, most courts have found that "an employer does not regard a person as disabled simply by finding that the person cannot perform a particular job." *Branham*, 392 F.3d at 904 (finding no evidence that the employer believed that plaintiff's impairment substantially limited him in one or more major life activities); *Dunaway*, 134 Fed. Appx. at 878 (finding that the imposition of limiting restrictions on standing, climbing, squatting, kneeling or lifting for the purpose of employment in one position with employer is not tantamount to a perception by employer that plaintiff was unable to perform these restricted activities in his daily life).

---

[37]Courts have frequently noted that because the "regarded as" disabled inquiry involves the examination of an employer's state of mind, evidence that would be offered to prove discriminatory intent, including that the employer's reasons were pretextual, may be relevant to the question of whether the employee was "regarded as" disabled. *See McElroy v. Phillips Med. Sys. N. Am., Inc.*, 127 Fed. Appx. 161 (6th Cir. Feb. 18, 2005); *Ross v. Campbell Soup Co.*, 237 F.3d 701, 708 (6th Cir. 2001).

When viewed in light of the law and undisputed material facts, the Court finds that Thompson's "regarded as" argument fails.  The Postal Service viewed Thompson through the lens of the permanent work restrictions provided by Dr. Jeu, not through any lens of "myth, fear, and stereotype."  There is no dispute that Thompson had work restrictions that permanently prohibited him from stooping, repeated bending, kneeling, climbing other than to change light bulbs, and pushing or pulling heavy equipment.  *See* Pl.'s Dep. at 216 (in 1998, in Plaintiff's first application for disability retirement he writes that, "I am not able to perform all of my jobs because of my back.  I can't push [and] pull mail carts, can't bend over to do my jobs").  Thompson's supervisors, Hanks and Jarrells, looked to Thompson to clarify those restrictions so they could determine his on-the-job abilities.  Thus, to the extent that a question of fact may have existed as to Thompson's abilities,  it was not because Defendant did not make an effort to accommodate him.

Further, any existing question of fact was actually *created* by Thompson himself.  It is uncontroverted that Thompson specifically ordered his doctor *not* to clarify his work restrictions for Hanks after she had requested further information from him following the DOL's denial of his worker's compensation appeal.[38]  Thompson's  improper conduct in response to Defendant's

[38]Around the time that the DOL denied his worker's compensation appeal, Thompson began to tell Hanks that if she would let him try, he would be able to perform all of his assigned jobs within the limits of his work restrictions.  As a result, Hanks, seeking clarification of Plaintiff's work restrictions, drafted a detailed letter describing Thompson's position and asked Dr. Jeu to clarify what duties Thompson could or could not perform safely.  Considering both Thompson's own testimony and a handwritten note reflecting Dr. Jeu's response to Hanks informing her that Thompson did not want him to answer her inquiry, the Court agrees that it is reasonable to assume that Thompson *ordered* his physician not to respond.  At oral argument, Plaintiff's Counsel noted that he had good reason to prevent Dr. Jeu from responding in that, in the two years following his injury he had been restricted to working fewer than 40 hours per week, and, as such, had developed an antagonistic relationship with his employer.  The Court, however, is not persuaded that this alleged "antagonism" is a legitimate excuse for Thompson's

legitimate request for information "dooms his 'regarded as' claim as a matter of law."  *See Haulbrook v. Michelin N. Am. Inc.*, 252 F.3d 696, 704-05 (4th Cir. 2001) (holding that any "misperception" by employer after employee's physician determined he could return to work with no restrictions was due to plaintiff's lack of reasonable diligence in engaging in reasonable dialogue with employer).  The Rehabilitation Act is "[a] shield to protect" individuals from disability discrimination; it is not a sword for him to manipulate disability law by producing permanent work restrictions, ordering his doctor not to respond to a request for information about those restrictions, and later arguing "misperception in a 'regarded as claim.'"  *See Haulbrook*, 252 F.3d at 704-05.

### 3. Otherwise Qualified[39]

Defendant also argues that, whether the Court finds that Plaintiff established that he was actually disabled under the meaning of the Rehabilitation Act, or, at least, that he was "regarded as" such, Plaintiff's case still fails because he has not established that he was "otherwise qualified" for his position with the Postal Service despite his alleged disability: (1) without accommodation from the Defendant; (2) with the alleged essential job requirement,[40]

---

actions.

[39]The Court may grant Defendant's motion for summary judgment based solely on Plaintiff's failure to establish that a genuine issue of material fact exists as to whether or not he is "disabled" under the meaning of the Rehabilitation Act.  Nonetheless, the Court has chosen to examine each element of Plaintiff's prima facie case.

[40]"The term *essential functions* means the fundamental job duties of the employment position the individual with a disability holds or desires."  *See Bennett*, 15 F. Supp. at 1110 (citing 29 C.F.R. § 1630.2(n)(1)).  "The term 'does not include the marginal functions of the position.'"  *Id*.  The regulations state that:

A job function may be considered essential for any of several reasons, including but not limited to the following:

that is the ability to work without his limiting job restrictions; or (3) with a proposed reasonable accommodation. *See Monnette*, 90 F.3d at 1186.

Whether a particular function is essential is a factual determination that must be made on a case-by-case basis. *See Bennett*, 15 F. Supp. 2d at 1110. "In determining whether or not a particular function is essential, all relevant evidence should be considered." *Id*. Part 1630 of the Rehabilitation Act lists various types of evidence, such as an established job description, that should be considered in whether a particular function is essential.[41] *See* 29 C.F.R. § 1630.2(n)(3). Since the list is not exhaustive, however, other relevant evidence may also be presented. *Id*.

Direct evidence on the "otherwise qualified" issue falls into two broad categories: (1)

----

(i) The function may be essential because the reason th position exists is to perform that function;
(ii) The function may be essential because of the limited number of employees available among whom the performance of that job can be distributed; and/or
(iii) The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.

*Id*. § 1630.2(n)(2).

[41]The regulation reads,

[e]vidence relevant to the determination of "what functions are essential includes, but is not limited to: (i) The employer's judgment as to which functions are essential; (ii) Written job descriptions prepared before advertising or interviewing applicants for the job; (iii) The amount of time spent on the job performing the function; (iv) The consequences of not requiring the incumbent to perform the function' (v) The terms of a collective bargaining agreement; (vi) The work experience of past incumbents in the job; and/or (vii) The current work experience of incumbents in similar jobs.

*See Id*. § 1630.2(n)(3).

those in which a plaintiff is not seeking a reasonable accommodation[42] but is instead making the straightforward claim that he or she can, in fact, function capably in the sought after position as it exists; and (2) those in which a plaintiff challenges a particular job requirement as unessential or claims that he or she can do the job with reasonable accommodations on the part of the employer.[43]  *Monette*, 90 F.3d at 1182.  In cases in which a plaintiff claims to be qualified to perform the essential functions of the job without reasonable accommodation, where the employer's defense is that the employee's handicap precludes satisfactory job performance, objective evidence will suffice to establish the fact in question; namely, whether the employee's handicap renders him or her unqualified to perform the essential functions of the job.  *Id*.  In such cases, there is no immediately apparent need to shift the burden to the employer on the issue of whether the employee can perform the essential functions of the job, and the disputed

_____

[42]The term "reasonable accommodation" includes:

(A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and
(B) job restructuring, part-time or *modified work schedules*, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

*See Berry v. City of Savannah, Tennessee*, 1999 WL 196557, *4, n.9 (6th Cir. April 1, 1999) (citing 42 U.S.C. § 12111(9)).

[43]Some courts have distinguished cases in which an employee claims that a particular job requirement is not essential for satisfactory job performance from those in which an employee seeks a reasonable accommodation on the part of the employer.  *Monette*, 90 F.3d at 1183, n.8. The claims may indeed differ analytically.  As a practical matter, however, these cases are virtually indistinguishable.  In either case, the plaintiff will have the burden of establishing that he or she is otherwise qualified to perform the essential functions of the job, absent the challenged job criteria or with the proposed reasonable accommodation.  *Id*.  The employer then bears the burden of proving that a particular job requirement is essential as a business necessity, or that a proposed accommodation imposes an undue hardship upon the employer.  *Id*.

-32-

factual question can, therefore, be resolved through traditional methods of proof. *Id*.

In cases in which a plaintiff seeks some accommodation on the part of the employer and is claiming that he or she would be qualified to perform the essential functions of the job with such reasonable accommodation, the disputed issues are whether such accommodation is reasonable, whether such accommodation would impose an undue hardship upon the employer, and whether the plaintiff is capable of performing the job even with the suggested accommodation, each of which may also be resolved through direct, objective evidence. *See Monette*, 90 F.3d at 1183.

The ADA provides a guide for determining the burden of proof in these cases. *Id*. 42 U.S.C. § 12112(b)(5)(A) states that an employer has "discriminated" against a disabled individual by, "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." *See* 42 U.S.C. § 12112(b)(5)(A). The Court in *Monette* held that the language of § 12112(b)(5)(A) makes it clear that "[t]he employer has the burden of persuasion on whether an accommodation would impose an undue hardship." *See Monette*, 90 F.3d at 1183. The disabled individual, on the other hand, bears "the initial burden of proposing an accommodation and showing that *that* accommodation is objectively reasonable." *Id*. Similarly, the court in has *Vande Zande v. State of Wisconsin Dep't of Admin*. described the employee's initial burden on this issue as showing "that the accommodation is reasonable in the sense both of efficacious and of proportional to costs." *See* 44 F.3d 538, 543 (7th Cir. 1995). Additionally, nothing in the statute itself alters the burden of

proof a disabled individual bears to establish that he or she is capable of performing the essential functions of the job with the proposed accommodation. *Id*. at 1183-84.[44]

In this case, Plaintiff asserts that Mr. Thompson has met the burden of establishing that, despite his disability, he can perform his position either with or without accommodation from the Postal Service.[45] Defendant, however, contends that, considering the essential functions of Thompson's position with the Postal Service, no reasonable jury could find that he could perform his job without violating his work restrictions.

### a. Whether Plaintiff has Shown that he was "Otherwise Qualified" for his position with the Postal Service Without Accommodation

Plaintiff argues that Thompson's testimony shows that he could perform all of his regular job tasks, outside of pushing the full APCs to the loading dock.[46] Further, Plaintiff contends that, despite his restrictions, he repeatedly informed his supervisors that he could perform the job, if

---

[44]The Sixth Circuit has explained:

[p]ut simply, if the employer claims that a proposed accommodation will impose an undue hardship, the employer must prove that fact. If the employer claims instead that the disabled individual would be unqualified to perform the essential functions of the job even with the proposed accommodation, the disabled individual must prove that he or she would in fact be qualified for the job if the employer were to adopt the proposed accommodation.

*See Monette*, 90 F.3d at 1184.

[45]Plaintiff also asserts that he could perform the job if a "job requirement" were "eliminated." *See Monette*, 90 F.3d at 1186 (in which the plaintiff asked that the defendant employer might hire another part time employer to work the afternoon shift). This Court, however, deems the above to be a suggested "reasonable accommodation." As such, it does not need to be assessed separately as suggested by Plaintiff in his Opposition Motion.

[46]The parties dispute how much time Plaintiff had to spend dealing with the APCs each day. According to Plaintiff, "pushing the APCs full of mail to the loading dock was a small component of his job, literally only taking a few minutes each day." Pl.'s Opp. at 14. Defendant argues, however, that Plaintiff had to load and unload the heavy APCs more often.

-34-

they would only have "let him."  Plaintiff alleges that, on Defendant's motion for summary

judgment, given the parties' dispute over whether Thompson could perform his job within the

bounds of his job restrictions, the Court should consider the facts in favor of the Plaintiff.

Further, he asserts that the Court should consider Mr. Thompson's assertions that he could do his

job to be more credible than the testimony of Ms. Hanks.

At this stage of the litigation, Thompson is entitled only to reasonable inferences.  His

blanket assertions that he could perform the essential functions of his job *at all times* within his

medical restrictions should be negated because they directly conflict with the actual work

restrictions Dr. Jeu had given him, the regular duties he performed before incurring his back

injury, and his prior sworn statements seeking both disability retirement and worker's

compensation benefits.  Thompson's assigned position at the Post Office required him to push

and pull APCs, climb, stoop and kneel.  Also, the standard building maintenance custodian

qualifications include both climbing and stooping as essential functions.  He had to stoop to do

basic duties like clean toilets in the four bathrooms, sweep, vacuum and wax the floor, and

uncrate and assemble carrier cases and desks.  Further, he had to bend repeatedly or stoop to

empty at least twenty to twenty-five short trash cans a few times a day.

Thompson even concedes that his job involved stooping and that the physical demands

of his back problem would likely be aggravated by the physical demands of his job.  In seeking

worker's compensation benefits, Thompson stated that he was supposed to load salt bags totaling

"800 to 1,600 lbs" onto a truck and then take them to the basement."  Indeed, in seeking

disability benefits, Thompson wrote, "I can't push and pull mail carts, can't bend over to do my

jobs."  Also, Dr. Jeu agreed that Thompson's back pain would likely increase due to "the

physical aspects of his job." *See* Pl.'s Med. Rec. at 23. Considering that Thompson's blanket assertions are in direct conflict with the regular duties he performed before injuring his back, his prior sworn statements seeking worker's compensation and retirement benefits, and the actual work restrictions given to him by Dr. Jeu, the Court is persuaded that no reasonable jury could find that Thompson could perform the essential functions of his position without accommodation from Defendant to limit or eliminate Plaintiff's stooping, kneeling, repeated bending, climbing other than to change light bulbs, or pushing and pulling heavy equipment.

**b. Whether the Post Office Can Show that Accommodation Would be an Undue Burden**

Plaintiff also contends that the Post Office has failed to show that accommodating Plaintiff's disability would be an "undue burden." He tries to argue that because the Postal Service never attempted to "accommodate him, [it has] failed to show that accommodation would have been an undue burden." Even assuming there was any reasonable accommodation that the Postal Service could have made for Thompson, because he was not *actually* disabled, he was not entitled to it . *See Workman v. Frito Lay*, 165 F.3d 460, 467 (6th Cir. 1999); *Kaplan v. City of North Los Angeles*, 323 F.3d 1226, 1231 (9th Cir. 2003); *Weber v. Strippit, Inc.*, 186 F.3d 907, 917 (8th Cir. 1999).

Moreover, Thompson never even made an initial request for an accommodation. Courts have found that the Rehabilitation Act calls for an "interactive process" between employers and employees, and, as such, where the Plaintiff has not come forward to assist his employer, he has clearly not acted in the spirit of the statute. *See Monette*, 90 F.3d at 1187 (finding that employers are not required to create new positions for disabled employees in order to reasonably accommodate them); *Reisiger v. West*, 221 F.3d 1339 (7th Cir. 2000) (citing *Rehling v. City of*

-36-

*Chicago*, 207 F.3d 1009, 1014-15 (7th Cir. 2000) ("Notwithstanding the employer's obligations

with respect to the interactive process, our cases make clear that it is the plaintiff's duty in the

context of a lawsuit to identify available positions to which the employer might have assigned

[him] as an appropriate accommodation to [his] disability.")); *Trobia v. Henderson*, 2005 WL

1800630 (2d Cir. Aug. 1, 2005) (citing *Lovejoy-Wilson v. Noco Motor Fuel, Inc.*, 263 F.3d 208,

219 (2d Cir. 2001) (noting that the interactive process between an employer and his employee

might include "meeting with the employee who requests an accommodation, requesting

information about the condition and what limitations the employee has, asking the employee

what he wants, showing some sign of having considered the employee's request, and offering

and discussing available alternatives when the request is too burdensome")).   Hence, Plaintiff is

not "otherwise qualified" for his Postal Service job either with or without accommodation.

### C. Retaliation

Plaintiff also alleges that Defendant retaliated against him for his EEO complaints.  He

claims that his January 18, 1999 EEO complaint was a factor in the agency's decision to charge

him AWOL for an unapproved absence on Monday, December 20, 1999, when he was out

receiving Lasik corrective eye surgery.  Defendant, however, seeks summary judgment on

Plaintiff's retaliation claim arguing that Plaintiff fails to make out a prima facie case of

retaliation and does not rebut the Postal Service's legitimate, nondiscriminatory reasons for

following his work restrictions, and ultimately separating him from employment.[47]

---

[47]The Court agrees with Defendant's assertion that Thompson's complaints about
"harassment" do not amount to an "adverse employment action" deserving protection under the
Rehabilitation Act.  *See* Def.'s Motion for Summary Judgment at 19, n.10.  "The court must
determine whether an employment action is adverse on a case-by-case basis. . . [and i]n
evaluating a claim of retaliation, courts have indicated that 'not everything that makes an
employee unhappy is an actionable adverse action."  *See Bennett*, 15 F. Supp. 2d at 1113.  "[A]n

Although the Rehabilitation Act itself provides no cause of action for retaliation, the

regulations promulgated pursuant to it do so.  *See Bennett*, 15 F. Supp. at 1112.  Section

1614.101(b) of Title 29 of the Code of Federal Regulations provides that:

> [n]o person shall be subject to retaliation for opposing any practice made unlawful by. . .
> the Rehabilitation Act. . . or for participating in any stage of the administrative or judicial
> proceedings under the Act.  To establish a prima facie case of retaliation in violation of
> the Rehabilitation Act, a plaintiff must show: (1) that he engaged in activity protected
> under the Act [of which the employer was aware], (2) that he suffered an adverse
> employment action subsequent to or contemporaneous with such protected activity, and
> (3) that there is a causal connection between the protected activity and the adverse
> employment action.

*See id*. (citing 29 C.F.R. § 1614.101(b)); *see Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 581

(6th Cir. 2000).  Considering the evidence in the light most favorable to the Plaintiff, Thompson

has failed to allege a prima facie case of retaliation under both the direct approach and the

indirect approach.

### 1. Direct Evidence of Retaliation

Evidence of retaliation is "direct" when "if believed, it would prove the fact in question

without reliance on inference or presumption."  *Jacklyn v. Schering-Plough Healthcare Prods.*

*Sales Corp.*, 76 F.3d 921, 926 (6th Cir. 1999) (noting that direct evidence is "evidence which, if

---

actionable adverse action is one that affects the 'terms, privileges, duration, or conditions of
employment."  *See id*. (citing *Yerdon v. Henry*, 91 F.3d 370, 378 (2d Cir. 1996)).  "Examples of
actionable adverse action include disciplinary demotion, termination, unjustified evaluations and
reports, loss of normal work assignments, and extension of a probationary period."  *Id*.  A
"threatened letter of warning," however, "is not an adverse employment action as a matter of
law."  *See Id*. (finding that the letters and requests for information from plaintiff preceding
plaintiff's eventual termination do not constitute adverse employment action because they do
not, of themselves, disadvantage plaintiff to any extent, and they do not alter "the privileges,
duration, or conditions of [plaintiff's] employment").  As such, though Thompson complained
that Hanks retaliated against him by calling him at home, calling his doctor and telling him to
work, and allegedly harassing him, these are not adverse employment actions as a matter of law,
and this Court  need not consider whether they impact Plaintiff's case.

believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employee's action"); *Mannie v. Potter*, 394 F.3d 977 (7th Cir. 2005) (citing *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003)).  "This essentially requires an admission by the decision-maker that his actions were based on the prohibited animus."  *Schering-Plough*, 76 F.3d at 926.[48]

Though Plaintiff argues that he was terminated by Defendant, at least in part, because he filed several EEO complaints, he has presented no facts to show support for his assertion. Considering the facts on the record in the light most favorable to Plaintiff, neither Hanks nor Jarrells, the Plaintiff's two superiors at the Postal Service, ever indicated that, Thompson was "fired" *because* of his EEO Complaints.  Also, Thompson's argument that his duties were reduced because Hanks and Jarrells wanted to retaliate against him are not the most plausible explanation for his eventual firing.  As supervisors, Hanks and Jarrells were responsible for ensuring that employees, like Thompson, stayed within the boundaries of their work restrictions. Though he continually asserted that he could perform his job, Dr. Jeu issued Thompson multiple work restrictions, and, according to Hanks, he was, therefore, unable to adequately function as a Postal Service employee.  Moreover, Thomson never assisted Defendant in clarifying those work restrictions.  Hence, Defendant has met its burden of presenting a legitimate non-discriminatory reason for Plaintiff's firing.  The Court will now discuss whether Plaintiff has produced indirect evidence of Defendant's alleged retaliation.

---

[48]"In contrast to purely circumstantial cases of retaliation, an employee who has presented direct evidence of improper motive does not bear the burden of disproving other possible non-retaliatory reasons for the adverse action.  Rather, the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive.  *Id.* (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 244-45 (1989)).

## 2. Indirect Evidence of Retaliation

Indirect or circumstantial evidence of retaliation is analyzed under the *McDonnell Douglas-Burdine* burden-shifting analysis.  *See McDonnell Douglas Corp*, 411 U.S. at 792; *Burdine*, 450 U.S. at 248; *Mannie*, 394 F.3d at 984.  Accordingly, to allege retaliation, Plaintiff must demonstrate that after engaging in protected activity, he was subjected to an adverse employment action though he performed his job satisfactorily, and that no similarly situated employee who did not file a charge was subjected to the adverse employment action.  If the plaintiff is able to do so, a mandatory presumption of discrimination is created and the burden shifts to the defendant-employer to "articulate some legitimate, nondiscriminatory reason for the employee's [treatment]."  *Id*.  If the defendant carries this burden, then the plaintiff must prove that the proffered reason was actually a pretext to hide unlawful discrimination.  *Id*.  The plaintiff may establish that the proffered reason was merely pretextual by showing that: (1) the stated reasons had no basis in fact; (2) the stated reasons were not the actual reasons; and (3) the stated reasons were insufficient to explain the defendant's action.  *See Wheeler v. McKinley Enters.*, 937 F.2d 1158, 1162 (6th Cir. 1991).  "A reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason."  *St. Mary's Honor Center*, 509 U.S. at 515.

Plaintiff has failed to establish a prima facie case of retaliation using indirect evidence because he has not produced sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action.  Plaintiff relies on temporal proximity in his attempt to establish a causal connection between his previous EEO charges and his later reduction in hours and separation.  Nonetheless, Plaintiff's

-40-

claim must fail because according to past precedent, temporal proximity alone is insufficient to establish the causal connection necessary to make out a prima facie case of retaliation.  *See Nguyen*, 229 F.3d at 563; *see also, EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997) (asserting that temporal proximity alone is not sufficient to establish a causal connection between the protected activity and the alleged discriminatory act); *McElroy v. Phillips Med. Sys. N. Am., Inc.*, 127 Fed. Appx. 161, 171 (6th Cir. Feb. 18, 2005) ("Federal standards are clear that temporal proximity, standing alone, is insufficient to establish a causal connection for a retaliation claim."); *Bennett*, 15 F. Supp. 2d at 1113 (noting that a short time period elapsing between the plaintiff's protected activity and the defendant's adverse employment action does not support a reasonable inference of a causal connection, "given the total dearth of other evidence of discriminatory motive"); *Walborn v. Erie Cty. Care Facility*, 150 F.3d 584, 589 (6th Cir. 1998) (allegedly retaliatory actions taking place after the plaintiff has engaged in protected activity are insufficient to establish a causal connection); *Cooper v. City of N. Olmstead*, 795 F.2d 1265, 1273 (6th Cir. 1986) (four months between protected activity and allegedly retaliatory action insufficient to establish a prima facie case).

Instead, Thompson must produce sufficient indirect evidence to support an inference that had he *not* filed EEO complaints, the adverse employment action would not have occurred. *Nguyen*, 229 F.3d at 563.  In each case upon which Thompson relies to support his temporal proximity argument, the plaintiff made a prima facie case by showing evidence in addition to both temporal proximity and knowledge of the decision makers.  *See e.g. Johnson*, 215 F.3d at 570 (holding that two strong performance evaluations occurring an EEOC complaint filed December 5, 1995, followed by negative evaluation given on January 9, 1996 and termination on

-41-

January 17, 1996, in addition to temporal proximity and knowledge of discriminating official, provided the necessary evidence to establish causation); *Weigel v. Baptist Hosp. of E. Tennessee*, 302 F.3d 367, 381 (6th Cir. 2002) (holding that a sufficient showing of causation was made because "in addition to temporal connection and knowledge" exit questionnaire containing complaints of discrimination influenced the decisionmakers to reject plaintiff's application for rehire shortly after one decisionmaker who had not looked at the personnel file suggested offer would be given).

Not only does Thompson fail to offer any evidence beyond temporal proximity between his EEO complaints and his reduction in hours, but also, the evidence with respect to timing is actually *fatal* to his retaliation claim.  His work hours were reduced *before* he filed his January 1999 EEO complaint, the earliest one at issue; in fact, Thompson filed the January 18, 1999 EEO complaint *because* of the reduction in work hours.  *See* Pl.'s Dep. Ex. 17 (listing allegation that "Physical Disability (Back Injury) was a factor in the Agency's decision when on October 30, 1998, the Postmaster reduced his hours after the Office of Worker's Compensation Program (OWCP) denied his claim.").[49]  This reduction in hours occurred because the DOL initially denied Thompson's worker's compensation claim on September 24, 1998, and Thompson subsequently produced increased work restrictions from Dr. Jeu that permanently prohibited him from pushing, pulling, bending, repeated bending, and/or stooping.  *See* Pl.'s Dep. at 179.

Thompson further argues that he was fired only a few months after filing his second and third EEO complaints.  Even assuming a legitimate claim of temporal proximity, Thompson fails to provide any evidence that Hanks or Jarrells even knew about these charges when they issued

─────────────────────

[49]The absence analysis reports show that Thompson began working reduced hours on November 2, 1998.  *See* Jarrells' Decl. Ex. 1.

the Notice of Proposed Separation for Disability dated May 12, 2000, let alone whether they took those charges into account when proposing disability separation.  *See* Hanks' Dep. ex. 10. Further, Steve Eldridge, Manager of Post Office Operations, was the Postal Service official who issued the Letter of Decision to Thompson on June 14, 2000 after making an independent review of the evidence.  Hanks' Dep., Ex. 10 at 2.  Thompson fails to present any evidence that Eldridge knew of his EEO complains or took them into account in his decision to separate Thompson from the Postal Service.  It is well-settled that Thompson's conclusory allegations and subjective beliefs are insufficient to establish a claim of retaliation as a matter of law.  *Mitchell*, 964 F.2d at 585.  Thus, summary judgment for Defendant is appropriate.  *See Celotex*, 477 U.S. at 322-23.

### 3. Pretext

Finally, even if the Court finds Plaintiff has successfully established a prima facie case of retaliation, he has still failed to show that the Postal Service's legitimate nondiscriminatory reason for reducing Plaintiff's work hours and eventually separating him was merely pretext for retaliatory discrimination."  *See McDonnell Douglas*, 411 U.S. at 792.  The Postal Service's reasons for separating Thompson are grounded in the Employee and Labor Relations Manual 15.1, providing that an employee "incapable of performing the duties of the position" may be separated for disability.  *See* Employee and Labor Relations Manual § 354.341.  Thompson was separated because the documentation he provided from his treating physician, Dr. Jeu, showed that he was permanently restricted from performing the regular duties of his position, and he did not have an approved worker's compensation claim.  Because of his permanent work restrictions, the Postal Service spent $9,245.60 to contract with an outside cleaner.

To rebut a defendant's legitimate, nondiscriminatory reason, a plaintiff must plead facts

demonstrating that a defendant's reason: (1) the stated reasons had no basis in fact; (2) the stated reasons were not the actual reasons; and (3) the stated reasons were insufficient to explain the defendant's action.  *See Wheeler*, 937 F.2d at 1162.  "A reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason."  *St. Mary's Honor Ctr.*, 509 U.S. at 515.

Thompson's efforts to show pretext fail under all three of the foregoing methods.  First, Thompson clearly cannot argue that the Defendant's stated reasons for reducing his hours and ultimately separating him – mainly that he was unable to carry out his position with the Postal Service on account of his physical impairment – had no basis in fact. He cannot now show that it is factually false that: (1) he produced work restrictions permanently prohibiting him from stooping, repeated bending, kneeling, climbing other than to change light bulbs, and pushing or pulling heavy equipment; (2) he ordered his doctor *not* to respond to the Postal Service's request for further clarification on his physical impairment; and (3) the Postal Service had to pay $9,245.60 per year to a contract cleaner to perform the essential functions of Thompson's custodial position that he was unable to perform due to his work restrictions.  Further, though Thompson asserts that Hanks told him "she did not believe in worker's compensation," this would not create a question of fact as to whether he has a legitimate claim under the Rehabilitation Claim.  Whether Hanks believed in worker's compensation or not would be irrelevant as to whether she thought that, given his injury, Thompson was unable to do his job.

Second, Thompson has not shown that the Defendant's stated reasons for releasing Thompson were not the *actual* reasons because he has shown no circumstances tending to prove that retaliation for protected activity was more likely than the reason provided by the Postal

Service.  He has not alleged facts that show that the Postal Service had any knowledge of his EEO complaints, let alone that their decision to reduce his hours was based on those complaints as opposed to his problems performing all aspects of his position.

Third, Thompson fails to show that a similarly situated employee received disparate treatment for the same conduct as evidence that Defendant's stated reason did not motivate his discharge.  *See Wiegel*, 302 F.3d at 738-79.  To make out this type of disparate treatment claim successfully, "[t]he plaintiff and the employee with whom he seeks to compare himself. . . must be similar in all *relevant* aspects."  *See id*.  Therefore, "the individuals must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or their employers' treatment of them for [that conduct.]" *Mitchell*, 964 F.2d at 583.

Thompson argues that the Post Office treated him unfairly by making efforts to accommodate Jarrells' personal circumstances without penalizing him, but firing Thompson for similar conduct.  It is uncontroverted that when Jarrells took leave from his position with the Postal Service from November through May 2002 due to "personal circumstances," the Post Office reassigned him to a management position as an attendance control supervisor at the main Post Office in Columbus, Ohio, and as a customer service supervisor at both the Grove City and Galloway, Ohio post offices.  *See* Jarrells' Dep. at 46-51.

The Court finds, however, that Thompson and Jarrells are not "similarly situated" in any relevant respect.  Thompson was a custodial employee, and Jarrells, on the other hand, was his *supervisor*.  Jarrells' Dep. at 49.  Thompson provided his employer with work restrictions that, according to his employers, *permanently* prohibited him from engaging in some of the very

physical movements that were necessary for him to perform his job while Jarrells' temporary job placement was voluntary.  *See* Hanks' Decl. ¶ 9.  Furthermore, when Hanks attempted to ask Plaintiff's doctors to clarify his medical condition and its corresponding work limitations, Plaintiff admits that he asked that Dr. Jeu refrain from providing her with the necessary information; whereas, Jarrells made an effort to work *with* his employers to find an interim solution.  Lastly, Thompson cannot show that there was any position available for him at the time he applied for permanent light duty while, on the other hand, Jarrells knew of and received some other permanent light duty positions at post offices in other cities.  Because Plaintiff has not shown that he was similarly situated to Jarrells, he cannot use his allegations of disparate treatment to establish pretext.

Accordingly, Plaintiff has failed to allege a prima facie case of retaliation because he has not pled causation, and because he has failed to rebut Defendant's asserted legitimate nondiscriminatory reason for discharging Plaintiff.  The Court, therefore, dismisses Plaintiff's retaliation claim.

## V.  CONCLUSION

For the foregoing reasons, the Defendant's Motion for Summary Judgment is **GRANTED** on all counts.  This case is hereby dismissed.

**IT IS SO ORDERED.**


   **s/Algenon L. Marbley**
   **ALGENON L. MARBLEY, JUDGE**
   **United States District Court**


**DATE: March 27, 2006**